Mr. Wagner Good morning, and may it please the court Avi Wagner on behalf of plaintiff's appellants. Just a brief logistics note. I'll be handling I spoke with my colleague miss Wolke I'll be handling the entirety of The opening as well as so we don't have to worry about that division. Be sure to keep your voice up. Yes This appeal concerns three transactions which collectively entrenched respondents Sardar Biglari and the entirety of the glory holdings board of directors First a royalty provision and the licensing agreement made Biglari and the board Irremovable that does so because the royalty provision if triggered would cripple the company Destroying up to 80 percent or more of its net revenues Second the big large capital transaction. I'll call the large capital BCC because we have the multiple big lorries gave mr Biglari at least five years control over at least three hundred twenty six million dollars of the company's assets And gave him thus a sixteen percent control block of the company's stock It does so without deliberation or valuation of these two critical components of the transaction It also allowed him to evade a shareholder imposed compensation cap where previously his compensation had been restricted to ten million dollars now Big Laurie holdings would pay BCC Uncapped compensation which could total tens of millions of dollars a year more than that ten million dollar figure Finally was the rights offering which the company itself described as in lieu of a dual class share structure a dual class share structure is A way traditionally of consolidating control in one share class while still continuing to increase equity Effectively retaining voting rights or expanding voter rights for that preferred class holder and the company described The rights offering is in lieu of that meaning to consolidate big lorries voting control We submit respectfully that we've raised the requisite reasonable doubt as to three or more of the company's directors below and above Respondents do not dispute that as to Big Laurie and as to a respondent Cooley We showed interestedness and we submit that we've showed interestedness To Cooper and we've also showed that Cooper and the entire governance Compensation and nominating committee failed to exercise reasonable business judgment. What does the record show about these? Directors their their qualifications their relationship to Big Laurie so these are pals of his or I would say that's true of Cooley and I would say Cooper has a lot of overlapping ties below. We made arguments as to all six We've abandoned as to three of the respondents The only ones we press are as to Cooley and Cooper Cooley was his college professor Professor has known him for approaching 16 years at this point in time Taught him was involved in BCC from its founding BCC was founded back in 2000 So predating the 2008 takeover they worked together on those matters Cooper likewise has been a long-term investor in the lion fund which BCC is comprised of two funds lion fund one and lion fund two Cooper is a long-term investor with $170,000 interest in the lion fund and he benefited From the transaction Big Laurie himself described it to his limited partners in the lion fund the non Big Laurie holdings limited partners He said that one of the benefits to them at this transaction that BCC repurchase in 2013 Was that it would reduce reduce administrative costs of the transaction. So he benefited in terms of protecting that transaction the other tie that we identify in the record between Cooper and Big Laurie is that Cooper has an entity called Ascot management and they both serve as managers directors of that entity together And that's been for many years as well But you say there are four directors who are not There are three other direct. There's a total six directors Big Laurie six includes six inclusive with Laurie the other three We're not pressing on appeal the the ties. We raised it below. We're not pressing if the other three Are are not suspected of you know, sort of Collusion or some monetary stake and going along with Big Laurie They they outvote the they well, your honor if it were three versus three that the standards we need to show it to half of the board and the Reason under Carson Aro, and that's six. Oh, I see. So right. It's six. So it's it's Kubi cooler and And Big Laurie and so we cite for example on that point your honor Carson Aro 65 a third at 637 That's 17 of our opening brief. The rationale in those cases is that if there's a deadlock that impedes the company as well So if half are have a disqualifying interest we win But we further submit that as to the other four non Cooley and non Big Laurie that they fail to reasonably exercise business judgment that we raised the requisite Reasonable doubt and at this stage the standard is that we need to raise a reasonable doubt not conclusively Disprove the business judgment and we submit considering both the deliberations and the substance of these three transactions Shows the requisite reasonable net doubt as to the exercise of business judgment first talking about the licensing agreement That agreement imposed a two and a half percent royalty contingent It doesn't kick into effect unless there's a triggering event But if that kicks in the company would have to pay mr. Big Laurie two and a half percent of gross revenues That exceeds 80% of net operating earnings Based on 2012 figures meaning the most recent year before figures the way the math works out on that is in 2012 The company had 740 million and of earnings So two and a half percent of that is in excess of 18 million dollars 21 and a half million and net earnings So well over 80% of net earnings would go to mr Big Laurie as the court might imagine paying 80% plus of net earnings for a company for a five-year period Destroys it or at least fundamentally alters the business that has the immediate effect of immediate effect of deterring would-be acquirers Deterring proxy contests similar It's a long time ago case But the court wrote in dynamics court for CTS many years ago Talking about a poison pill that was implemented for entrenchment purposes that when it's done to impede acquirers and p proxy contests That's classic entrenchment and a royalty of this provision of this magnitude is classic entrenchment What's particularly pernicious though? Is that it was done without meaningful deliberation one would expect that in the event aboard we're going to impose such a draconian royalty There would be a lot of valuation Analysis a lot of cost-benefit both on what the asset side is and what the liability side or contingent liability side is None of that is evident What we have the sum total of the end of deliberations is a one and a half page memo from an intellectual property attorney Not a valuation analysis saying well, there's some history of similar type of agreements and there's a reference to an agreement with Martha Stewart Putting aside the difference between Martha Stewart versus home products and mr. Big Laurie versus burgers and steaks Which I think facially is incomparable The scope of miss Stewart's royalty is far far narrower and it's really elective of the company what miss Stewart's royalty The memo says provides is that should Martha Stewart's company? Desire to continue to sell Martha Stewart branded products they can do so but they have to pay a royalty Basically, they make a choice Is it in our business interest to continue to sell these products or if it's not we cease to sell them and move on to? Other lines of product here. The royalty is effectively inescapable. It doesn't apply. There's no option to terminate There's no option to pivot the business. It would have the effect of on 2012 numbers reducing 80% plus of gross revenues So again particular considering the perniciousness of the royalty coupled with the minimalist Deliberations and the fact that the even that attorneys work product was shared with mr. Big Laurie and that he drove the transaction renders the Raises the requisite reasonable doubt as to business judgment One final thought in opposition what respondents say is well wait the company here got Valuable intellectual property and that's the consideration to support this But actually the the trademarks at issue were not ever first registered until many weeks after this transaction closed So if this is truly valuable intellectual property One would surmise it would have been safeguarded in the very least registered with the trademark office prior to this transaction if not many years before so the the trademark involved or the Involved adding big Laurie's name So the specific trademark theory that he's famous or something like that On the theory that there's value in his name and the value in the name big Laurie and the name big Laurie holdings Value to home He's not He's not well known to the public. I never heard of him for this case either your honor. Um, he's not Again, there's no deliberation. This is where the reasonable doubt comes in. It's not like the board said hey big Laurie is going to attract additional capital of X amount or Increase expected returns by X amount the type of even a back of an envelope type of deliberations that hey There's this value add there's nothing of a sort of those deliberations. It's all conclusory It's all about a half paragraph comparison to Martha Stewart And I think what your honor is touching on is is precisely where we're troubled There's no asset that we can discern the quote-unquote asset is the trademarks which aren't registered until after the fact But even assuming there's some peppercorn of an asset. There's no deliberations a Basic any kind of major transaction one would start. Here's the asset. Here's the liability Wholly absent from this kind of deliberation here and we think that alone Particularly coupled with that memo itself is first sent to the governance compensation nominated committee. It's pretty cursory It's first sent to them in a January 11th package that same day the agreements approved So it's not like this was the beginning of some long process where they started very basically and over the course of months or weeks Multiple meetings got deeper. This is kind of the beginning and the end of the deliberations As to the big glory capital transaction again, there's a memo and that's exhibit 9 to our complaint which Purports to rely on some kind of valuation analysis, although curiously it doesn't include that actual analysis, which says we're going to start with this Range that Towers Watson, Towers Perrin gave us and we're going to make adjustments but what it doesn't account for at all doesn't even mention is that Coterminously with that Transaction the company pledges three hundred twenty six million dollars in additional securities to mr. Big Laurie locks it up for a minimum of five years That a gives him a voting block so he can now vote these securities and there's a unique feature of Indiana law This court decided the summer case called core opportunities fund versus Emmett's 792 F 3rd at 739 and we discussed this case Indiana law has a unique feature that a company can actually hold its own securities and retire them Under Delaware law and I believe judge Easterbrook says in that opinion the law of every other state They're either retired or they're outstanding. Indiana has this kind of intermediate status, which is unique And so what big Laurie does is exploit that and there's nothing it's judge Easterbrook said in the opinion There's nothing pernicious about that per se in Indiana law The question is if it's done in a matter that's exploitive and for entrenchment purposes That's where the requisite reasonable doubt is raised as to these issues So again, there's no valuation component to the voting rights No valuation component to the fact that he's now able to evade his compensation cap What happens is big Laurie Holdings pledges the securities to big Laurie capital BCC BCC is now one in the same as mr Big Laurie, he's the sole owner no more boat board oversight nor our board control over these securities He can earn whatever he wants on them irrespective of the previously imposed and bargained for shareholder cap And also as an oversight matter because of the five-year lockup if the board were to say after two years, you know What the performance has been poor or we have a better option that precluded from doing so it's locked up for a minimum of five years We think again There's no deliberations on this. These are major transactions again As I said before in 2012 net profits were 20 million dollars So we're not talking about some hundred billion dollar conglomerate where this is an immaterial or insignificant This is the entirety of the franchise and and you're effectively giving away the entirety of the franchise with no deliberation No valuation as to what those deliberations do include though We take issue in our expert report professor black takes issue with one of the material deductions They do make they do make a 1.7 million dollar adjustment which kind of halves their bottom line valuation due to a supposed bonus Obligation owed to mr. Big Laurie, but that again is not extinguished by the transaction Big Laurie holdings had the obligation pre-transaction To mr. Big Laurie that obligation remains post transaction So it's what our expert professor black calls the phantom deduction now respondents say well the district court didn't rely on professor backs conclusions But really no one challenges as bona fides There's numerous Delaware decisions and the record below were professor black who's professor at Northwestern and has taught at numerous other esteemed institutions In this corporate governance arena, there's no challenge to this bona fides. Just no consideration by the district court finally Yes The first prong of the Aronson Analysis was waived While you're raising it in reply What they suspect say specifically is it's waived as to mr. Cooper. I don't think anyone disputes it It's not waived as to mr. Big Laurie or mr. Cooley as to mr Cooper the sites where we raise that in our opening brief are pages 10 and 12 where I believe we raise it The Ascot holdings part is on a footnote on one of those pages and in the body there we talked specifically about mr Cooper's long-term interest in the company another instance where that appears in the record Using this court's docket entries docket entry 20-3 page 447 specifically quantifies Mr. Cooper's interest But I think the reference to Cooper's interest is both in the complaint and repeatedly in the record But again as to as to the other two, there's no dispute and as to the second prong. I believe there's no dispute Finally turning to the the last transaction the rights offering The issue here is that this kind of cascades with other two transactions We have several months before this likeness agreement this licensing agreement, which effectively makes Big Laurie and the board removable Shortly thereafter a few months thereafter. We have this PCC transaction which locks up securities and this is kind of the last shoe-dropping Admittedly the control ultimately gained by this is less than the first two transactions But the point is is that this was done again without deliberation without meaningful consideration Done by unanimous consent of the GCN and again, it has further the effect of increasing. Mr. Big Laurie's Holdings at the expense of minority shareholders. So unless the court has further questions, I preserve It raised 75 million dollars, which obviously 75 million is 75 million But again, if you look at that, it's following the BCC transaction Big Laurie controls as the capital allocator He basically has sole discretion allocation He can now it should he wish move that to Big Laurie capital and that becomes instead of the 326 million that can now become 400 million dollars that he uses to evade his compensation cap that he uses to vote the stuff he can move it to BCC and That's now a new five-year lockup one final point It was 0.7 percent the 60 the big 16 percent block comes with a BCC transaction, that's true your honor One last point there's a statement that in the opposition that hey, you know You say the likeness agreement deters proxy contest but in fact in 2015 there was a proxy contest and what we say in reply and cite articles that subject judicial notice for this point is that the proxy advisors ISS and other advisors say Don't vote against Big Laurie because you're gonna have to pay a hundred million dollars on this So the fact that someone could try it and wage a futile war is not material The materiality is this ultimately dissuaded and impacted the proxy contest She is that table your honor, but she she's giving me her time Okay. Thank you very much. So mr. Clark Make please the court Chris Clark for Big Laurie Holdings and the board of Big Laurie Holdings. I think Mr. Wagner's last point was the most important There was a proxy contest the shareholders of the company could have voted for any one of the replacement of the board members For the replacement of the board members other than mr. Big Laurie For the replacement of the board members who voted for any of these transactions All of which were highly publicized by the people who ran the proxy contest All of which were at issue in the suit that was brought by the plaintiffs The the shareholders knew about each one of these transactions when they were asked to vote and it wasn't an all-or-nothing slate It's not a classified board at Big Laurie. So they they could have left. Mr Big Laurie on not had to pay under the trademark assignment agreement at all and replaced every other board member I don't know how it relates to the demand futility issue I think well, I think look the the plaintiffs are trying to put atmospherics forward your honor and I think those atmospherics are important to note that Demand-futility, especially in Indiana is a statement by the legislature that it wants boards and at that Then at a removed shareholders writ large to control litigation Not single shareholders not plaintiffs and with all due respect to the court in Indiana and this court not courts Boards make better decisions. For instance, there's a lot of rhetoric in this case about the hundred million dollars Well, the demand is supposed to be the It is for the board, right? Well, it was never made your honor. That's right There was no demand. I know the question is whether given the composition of the board and Their deference to Big Laurie and so on whether there would be any point, right? Absolutely, and the standard is the following Was any member of the board so conflicted that no reasonable? Fact finder could think they would fairly take a look at the demand. There's concession as to three members of the board There's Well, but hold on your honor because as to three of these as to two of these transactions including the trademark transaction They were approved by the GCN Okay, I can't see his name is adding I understand that's your honor's opinion to make you made it clear when mr Wagner was presenting. He's not a famous person he he is a very very prominent investor your honor and Boards are are delegated this Strategy, is it worth it? Is it worth it in the long run? This is a this is a licensing agreement that costs $0 Mr. Wagner misspoke. Actually, it is not irredeemable the board if it wants to at a change of control can forgive the payment and The board has a fiduciary duty, but he controls the board. He does not control the board your honor I miss pals that there is nothing in this record that these are his pals your honor. There's nothing in this record I'm sorry, your honor, but that's just speculation Nothing in this record. So first of all, there's no allegation as to three of the six members we conceded below. Dr Cooley there was no proof put on we conceded. Dr. Cooley. We may not have had to Mr. Cooper the sole allegation with regard to Mr. Cooper is that he's an investor in the lion fund Do you know who the largest investor in the lion fund is? the shareholders of the glory holdings The the one claimed disqualification of Mr. Cooper is that his economic interest is utterly aligned With the shareholders of the company that can't be a disqualification Obviously, it's a well stated premise of New York Stock Exchange listing rules and all the various shareholder advisory boards That we want board members to be invested in the securities of the companies that they represent. That's what mr Cooper's done he's invested and and it's all over the record and in fact, they point to the fact I don't think that's correct. We also want independent board members We do your honor and and think about I don't want all the board members to be invested in the company We don't want all the board members to be invested in the company. Well, there are others who aren't and on this board So that's that's fine, but we want some that are and some that aren't Mr. Cooper is one who has the exact same financial interest in you're arguing about the composition of the board rather than This first trend first transaction the fact that it gives him the opportunity eventually to To Obtain virtually the entire income of The of the company that's that's a canard your honor. It's an absolute canard So first of all, if your honor looks which is in the record at the annual report of the company the company right now as of the end of 2014 holds 766 point six million dollars in cash marketable securities and investments None of that money is subject to this agreement This agreement relates to 2.5 percent of the gross revenues from operations of the company All that but that constitutes a very large percentage of of the of the company's profit it doesn't your honor because if you look at the amount of money that's been made over the years and the way that the Increase in the investments and big lorry holdings told all the shareholders our purpose is to invest your money That's what we do. We invest your money and we grow it and we hold it and that money has grown if From 2011 there was two hundred and fifty two million dollars in such investments 2012 378 2013 365 and 2014 766 million dollars that mr. Big lorry in his sole discretion made for the shareholders Which is in never going to be paid out pursuant to the licensing agreement So I beg I take issue with your honor statement about the two point seven percent, right? That's revenue your honor to point in a given year. Yes, but given the rather limited Income of the company itself that Two point seven percent of revenues Constitutes a large fraction of the you know, but as your honor understands, but as the board understood as well or better Revenue and income are two matters that can be adjusted Based on the strategic goals of the company So for instance as the company grew these investments greatly it has certain tax liabilities It could realize much more income if it wanted to but it's decided not to and that's all publicly disclosed Because it doesn't want to undertake those tax liabilities and these kinds of complicated decisions about how to realize income What to do with revenue? What kind of strategic goals to pursue? This is what gets deferred to it to an unconflicted board. And that's what you have here your honor. I Don't think there's an I honestly don't think there's an honest to speed up. Mr. Wagner If I saw your honor write down some of the citations to the Cooper references in the brief, it just basically says mr Cooper it is never argued that he's conflicted in the opening brief Not not a single time we searched through the brief and put in the words Cooper and conflict and it doesn't turn up in that brief and The court may do that So there's not a there's not a real argument here that it's a conflicted board and what Indiana law more so than any other states Law in this country says is you give it to that board and for these reasons your honor I we're we're talking about complicated numbers whether or not you'd want to realize income from revenue What kinds of tax liabilities the company's going to have from the three-quarters of a billion dollars that mr Big Laurie made for the company. Those are decisions that boards should make because they understand it. Mr Wagner said several times up here. There was no deliberation. There was no deliberation. That's false There are board minutes that he got in discovery There are resolutions Understand. I thought the argument was that this two percent two point seven percent Royalty would translate itself in into most of the of the Of the revenue or the net worth of the company that's let me let me start to unpack it for your honor because it's tricky It's two point five percent of gross revenues, which by any measure is a modest measure it's not fifty percent It's not seventy five percent in a given year a company may especially an investment company May decide to realize revenues in various ways for instance Laurie holdings has had five hundred million dollars of securities gains in the last few years if it holds them It realizes no income and it has no tax If it sells them it realizes income but no revenue So there's this giant pot of money sitting over here That's never subject to the to the agreement But could greatly increase income if the company wanted to and it wanted to take the tax hit on it So the idea that because the company made a policy decision in one year To not pay income taxes and that this would somehow devastate the profitability of the company is not true It flies in the face of facts But also it again underlies why boards decide these things the board knows The board has these financial statements in front of it The board talks to the CFO and the board makes policy decisions Which by the way are written in the annual report about what it wants to do about the taxation of these Securities it owns what it wants to do about investments So I understand that that the numbers sound big when put that way But they're not The company could have realized a profit on five hundred million dollars of securities if it wanted to and That would have an enormous effect on the income and it would make 2.5 percent of its operating revenues virtually meaningless Now I underline though your honor the fact that mr. Wagner is wrong. Anyway that this agreement if for instance a Board all of whom has a fiduciary duty to shareholders right now and all of whom can be challenged at that time Not a dime has been paid under this agreement right now There's no damage If it becomes relevant Somebody can challenge the the board members then when we have some real facts But right now it's it's really asking this court on very limited information To second-guess a fully informed and very able board The majority of which there is no challenge to their independence. We don't claim. Mr. Big Laurie was independent. I Think With connection to the BCC transaction which was raised I Think the important thing to keep in mind there is in 2010 The glory capital corporation was owned by mr. Big Laurie He sold it to the company for $1. It's undisputed In 2013, he bought it back. It's undisputed for 1.7 million dollars It it's difficult for me knowing those facts to wonder why that's an unfair transaction of the company That it seems to me under the business judgment rule if the $1 Property in 2010 got sold back for $1. That would be perfectly fair and reasonable the company worked out a transaction where it derived a 1.6 million dollar profit and There's nothing about the fully disclosed fully vetted BCC transaction that in any way Disadvantages the company It's the same economics that it had before as the company stated in its SEC filings. The reason for it was certain people Analysts and shareholders said it would be much easier to understand the corporation if this were unpacked Company disclosed that it's I think the district judge even quotes it and that's the reason for that transaction. Nothing more finally the rights transaction is You know again, I think this really shows the level to which the plaintiffs are trying to second-guess a board It's an unmitigated boon to the corporation. The corporation makes 75 million dollars Mr. Bigilare gets and again, I guess one thing I'd like to say is You know the speculation in the complaint almost always turns out to be untrue in this case there's speculation that there'll never be a proxy contest because of the because of the licensing agreement Lo and behold, there's a proxy contest. There's speculation that Mr. Bigilare will vastly increase his voting Percentages because of the because of the rights offering he got six hundred and thirty seven more votes or shares than he had before 637 it did nothing to increase his control. What it did was it gained the company 75 million dollars at a very competitive price Moreover, it benefited all existing shareholders because it was sold to them at a discount. So When you when you start to really unpack these transactions and look at the merits of them Which the board did and which is the board's job? You can see that they're utterly fair to the corporation, but that's not my burden Right. My burden isn't to show as plaintiffs want it to be that these are good deals or these are deals that this court would endorse My burden is to show under Indiana law that the board didn't engage in reckless or willful misconduct That's the level of bad stuff. They had to do It's not the familiar Delaware standard of the irrationality, which is a very high standard it is whether or not the board engaged in reckless or willful misconduct and I Submit that this doesn't come close to that and to the extent that anybody has any questions about the economic Basis for the trademark transaction. That's a matter best left to a board one further issue that I'd like to address for the court Mark things seems very strange Why his name should have Your honor. I understand that your honor's view is that mr. Glory is not a well-known person He's a very prominent investor And I guess the way that it was put to the board and thought about by the board is what is the trade? I don't understand. Why does he what is his name? Yes Sophisticated investors don't care whether his name is in the Is is in their advertising, right Well, we're not necessarily just going after sophisticated investors. You're on We're not necessarily just going after sophisticated investors. It's a public company. I think there's never heard of big Laurie, I beg to differ. I'd like to answer what you think the unsophisticated Investor has heard of big Laurie. I do I think that he's cared He's covered very vastly on websites like the Motley Fool and the kind of I don't want to call them day traders The kind of sites that people follow when they're looking to invest small amounts of money But I think there's there are two reasons your honor The first is if somebody could have gotten a trademark to Warren Buffett's name for free in 1963 at the price of having him around They would have done it and your honor can disagree with this board that mr. Bar is the new Buffett. That's what this board thinks That's what this board believes and you know what your honor The results of this corporation seem to indicate that right now. How old is he? He's I think 36 years old Look, can I answer it one more way your honor getting back that to that? The licensing agreement. Mm-hmm, so Okay in 2000 twist. I mean correct me if I'm wrong, but in 2012 the two and a half percent would have been 17 and a half million dollars. That's correct. Your honor. He would get the 70 and a half but the net earnings in 2012 We're only 21 million, that's right, so he would walk away with with most of the earnings First of all, your honor. This is if he'd been removed as CEO and so on Three things first of all, no payments have been made Secondly the board's not the question, of course, right? I understand the board is able to decide And particularly in this company how much income it's going to realize from its investments So for instance in the next year, right your honor between 2012 and 2013 It gained approximately. I'm gonna do the math wrong 250 million dollars in It chose not to realize those gains and So its income is lower. And so and and look obviously that's why they've cherry-picked the number of income, right? But those are gains to the shareholders. They own that it's an increase in the value of the company The board just chose not to pay taxes on it and realize income But it can and it can when it thinks it's the right time And so it's again your honor. It's a canard to say that One year's income that got set when the company knew it didn't have to pay is somehow a measure of the Economic impact of this there's seven hundred and sixty six million dollars sitting in a piggy bank right here That's never affected by that contract and it's growing every day. That's that's based on end of year 2014 2015 will expect to be much higher So it really is a matter of the board Can control and understands these numbers and that's why it's designated delegated to them. Well, we said what were the What what were the Reported gains in 2014 2014 from 2013 Is that the question what was the reported income of the income I don't know that I had the income statement in front of me your honor I again would gather that it was kept low because there's a substantial investment gain that's marked from three six thirty five to seven sixty six and there's commentary in the annual report about Not wanting to pay taxes on that income. So Not wanting to realize that income and pay taxes on it. So I would gather it was kept low This is a long-term growth company. It's taking the money it earns and it's not realizing it as income. It's investing it That's what it does that's what its shareholders are told it does and so to say that if you look at net revenue or Rather gross revenue and its impact on net income is somehow the financial health of the company it's absolutely wrong and the board knows that and Investors know that again your honor if the investors were up in arms about this transaction Which they fully knew about they could have kicked out every single board member except. Mr. Big Laurie and They could have gotten they could have taken what they wanted. That's not what they did. They voted everybody back in One other matter before I unless you're as a question I think it's important that I don't think it's outcome determinative here I think the court obviously has taken a searching look at this case, and I think we went under de novo I think this court's law is that you review this case for an abuse of discretion I think there's a little bit of confusion. Is that I think that it's the same standard that you I wish someone would What does abuse of discretion mean? I think that you take the district courts well-reasoned opinion unless you find that she has made clear errors of law or has made You know clear errors in adopting inferences that you affirm that you you that the court obviously has made some searching thought about this Case just think she's wrong. I don't think you can reverse on an abuse of discretion standard that I don't get that Your honor knows better than I but in other words you have an appellate court and says no this decision is wrong but we can't say it's Insanely well, we talked I mean we didn't but earlier there was talk about clear error in the context of the criminal appeal Clearer that either. Well, I'm sorry your honor. I mean if you think someone has been wrongly convicted, what are you gonna say? Wrongly can we think they've wrongly convicted, but who knows? Judge Judge disagreed. Well, I think absolute innocent is innocence trumps clear error So that's I agree with your honor on that I think here abuse of discretion means again and particularly in this case where full document discovery was granted to the plaintiffs Where they had every piece of paper they'd have after summary judgment And where the district court reviewed all that had it in front of her and really went through it That I think there is a level of deference that should be given to her conclusions If there's no, oh, sorry, just as an aside When you were discussing with Judge Posner the notoriety or lack thereof of mr. Big Laurie, correct? Is he well known in in the restaurant investing area? Is that is that where? Well, that's that was the second part of the question that I wanted to give to mr. Judge Posner. Pardon me Again in the annual report one of the main areas of expansion for steak and shake right now is the Middle East That's where they're targeting. It's a company that's mature in the United States. The Middle East in Europe are where they're going Middle East. Yes, Kuwait Riyadh and and they're in there extraordinarily Syria They Syria not but I think they have eight stores in Riyadh and their franchise stores And mr. Big Laurie is actually a very high-profile person in the Middle East and he's a famous guy for having Escaped Iran with his parents hidden out in Istanbul as a kid come to the United States and made a great success of himself And so there is a cachet to his name there. That's higher than it is here in the restaurant industry. That's right, Your Honor Thank you so much Clark and mr. Wagner I'd like to walk through the numbers because there was some confusion I think and what mr. Clark said the two inputs are Gross revenues, which is the two and a half percent is paid of and then we're comparing that to net revenues Which is another way of saying profitability the torrent two and a half is off gross revenues and what you heard from. Mr Clark as well focusing on net revenues in one year is misleading in the record We have and this is docket entry 20-2 page 118. We have the five-year earnings proceeding this 2013 excuse me 2012 back to 2006 Lest the court think we cherry-picked. I'd like to talk about 2009. We talked about 2012 in 2009 The royalty that would be due to mr. Big Laurie would be 261% of net earnings ie 261% of profit that have to dick it dip into their, you know investments to pay that And you heard well, the company's had a lot of investment gains But investment gains are not the same as net even not earnings. There's going to be SG&A expenses. There's going to be taxes there's all sorts of expenses that would have to get paid before you get to that net earnings figure and then the whole of net Earnings are sometimes 261% of it get wiped away and I can do if the court would like the mathematics on the 261. It's a 629 million of earnings two and a half percent of that is over 13 million. What mr. Clark was saying was that The reported net earnings figure is not necessarily the economically meaningful Company but but over over five years your honor their net earnings never hit over 30 million. So this is not an Their highest yeah, and and they were as low as six million. So this 21 and a half is kind of down Main Street They've been slightly better and they've been quite a bit worse over a five-year trailing period As far as the the statement that in a proxy contents they could get rid of the whole board That's completely untrue. One of the triggers perhaps the most pernicious trigger In the likeness agreement is that there's a change of control ie the majority of the board Gets turned over the payment goes to mr. Big Laurie, and that's not a matter for the board to waive It goes to mr. Big Laurie. He would have to personally waive it. He doesn't want to do that He doesn't want to give up his voting block. He doesn't want to give up his 10 million base compensation Plus the BCC opportunity to evade it. There's simply no reason to believe he would have done it In fact, if he was going to waive it I'm not sure why he would have bothered with these transactions to begin with There's no consideration a brief word about the standards The standard of showing of recklessness is the standard of trial the standard at the pleading stage is to raise a reasonable doubt In Abbott labs and in Westmoreland This court has repeatedly stated constraint Delaware law which Indiana law follows that The question is just to raise a question as to business judgment. It's not proof of the ultimate issues here Finally As far as you know What Indiana law and how different deferential it is the most recent Indiana Supreme Court case which we cite they don't talk about at all In their briefs that we cite in our opening and reply is the TP orthodontics case and what that talks about is deliberations can't be shallow in execution or restricted in scope and Unfortunately, I think those are precisely the sort of deliberations we have here Lastly on the de novo versus abuse of discretion. I agree with your honor It's telling when you talk about some instances where I know abuse discretion applies amending complaints For example, you get into issues of undue delay and that's you know, where you have trial court deference We don't have any of these type of undue delay sort of issues here And again, the standard here has we've rate has have we raised a reasonable doubt we submit we have And that means that it's a legal error to find otherwise Okay. Well, thank you very much. Thank you My next